# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | John W. Darrah | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| CASE NUMBER | 01 C 6851 | DATE | 10/1/2002 |
| CASE TITLE | XCO INTERNATIONAL INCORP. vs. PACIFIC SCIENTIFIC COMPANY | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Pretrial conference held and continued to 10/10/02 at 1:30 p.m. Enter Memorandum Opinion And Order. XCO's motion for summary on count I of its first amended complaint is denied. XCO's motion for summary judgment on count I of Pacific's counterclaim is granted. XCO's motion for summary judgment on count II of Pacific's counterclaim is granted.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | |
|---|---|---|---|---|
| | No notices required. | | number of notices | Document Number |
| | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | OCT 02 2002 date docketed | | |
| ✓ | Docketing to mail notices. | | | |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| LG | courtroom deputy's initials | | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

XCO INTERNATIONAL INCORPORATED, )
)
Plaintiff, )
) No. 01 C 6851
v. )
)
PACIFIC SCIENTIFIC COMPANY, ) Judge John W. Darrah
)
Defendant. )

## MEMORANDUM OPINION AND ORDER

Plaintiff, XCO International Inc. ("XCO"), filed suit against Defendant, Pacific Scientific Co. ("Pacific"), alleging breach of contract. Pacific filed a counterclaim, alleging that XCO breached a licensing agreement between the parties (Counts I and II).

Presently before the Court is XCO's Motion for Summary Judgment on Count I of Its First Amended Complaint, XCO's Motion for Summary Judgment on Count I of Pacific Scientific's Counterclaim, and XCO's Motion for Summary Judgment on Count II of Pacific Scientific's Counterclaim.

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). All the evidence and the reasonable inferences that may be drawn from the evidence are viewed in the light most favorable to the nonmovant. *Miller v. American Family Mut. Ins. Co.*, 203 F.3d 997, 1003 (7th Cir. 2000). Summary judgment may be granted when no "reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).



## BACKGROUND

United States Patents Nos. 4,491,822 ("'822 Patent"); 4,540,972 ("'972 Patent"); and 4,614,024 ("'024 Patent") (collectively, the "U.S. Patents") were issued to Bayard C. Davis on January 1, 1985, September 10, 1995, and September 30, 1996, respectively. The U.S. Patents were assigned to XCO. (Plaint.'s 56.1(a)(3) Statement ¶¶ A4-6)[1].

The U.S. Patents include the claim that the insulation has "an insulation resistance variable with temperature over said temperature range between approximately 100 and 50,000 ohms...." (U.S. Patents). The second claim states that the "said insulation material comprises manganese dioxide heated in a vacuum furnace at a temperature of approximately 1650." (U.S. Patent).

### I. The Purchase Agreement and License Agreement

In February 1991, XCO entered into a Purchase Agreement with Pacific for the purchase of the U.S. Patents and all foreign patents and applications corresponding thereto (collectively, "the Patents"). (Id., at ¶ A7). At the same time, XCO entered into a License Agreement with Pacific granting XCO an exclusive license to use and sell metallic sheathed heat sensitive cable limited to the field of refractory line process vessels under the Patents throughout the world. (Id., at ¶ A8). Pursuant to the Purchase Agreement, the Purchase Agreement is construed in accordance with the laws of the state of Illinois. (Id., at ¶ A10). Pursuant to the License Agreement, the License Agreement is construed in accordance with the laws of the state of California. (Id., at ¶ A11).

---

[1] Statements of facts under Local Rule 56.1 as to Plaintiff's Motion for Summary Judgment on Count I of Its First Amended Complaint are designated by the prefix "A", statements of fact under local rule 56.1 as to Plaintiff's Motion for Summary Judgment on Count I of Pacific's Counterclaim are designated by the prefix "B", and statements of fact under local Rule 56.1 as to Plaintiff's Motion for Summary Judgment on Count II of Pacific's Counterclaim are designated by the prefix "C".

Under Paragraph 1.3 of the Purchase Agreement, the purchase price of the Patents consisted of a $725,000 cash payment at closing. In addition, Pacific was required to pay the greater of 5% of product sales or $100,000 per year beginning February 1, 1995, until February 1, 2000. (Def.'s 56.1(B)(3) Statement ¶ A7). Pursuant to the Purchase Agreement and XCO's demands for payment, Pacific made $50,000 semi-annual payments per year, totaling $250,000. The last payment was made and accepted in February 2000. (Id., at ¶ A9).

Paragraph 1.5.3 of the Purchase Agreement states:

> <u>Prorations and Future Expenses</u>. Any personal property taxes, patent maintenance fees, or other similar costs paid by SELLOR [XCO] prior to the Closing Date and relating to the Patent and Related Proprietary Rights after the Closing Date will be prorated as of the Closing Date. The amount to be paid to SELLER, as agreed to be the SELLER and PURCHASER [Pacific] shall be paid to SELLER at closing. After the Closing Date, PURCHASER will be responsible for all expenses of any kind relating to the Patent and Related Proprietary Rights, except SELLER will be responsible for any and all expenses related to the ongoing opposition to European Patent 0 078 675 Granted on Application 82 305756.7 XCO International Incorporated. (Plaint.'s 56.1(a)(3) Statement ¶ A12).

Paragraph 2.2.10 of the Purchase Agreement states:

> Taxes. PURCHASER warrants that all property taxes which become due and payable on the Patent and Related Proprietary Rights after the Closing Date will be paid and that there will be no outstanding liabilities incurred against the Patent and Related Proprietary Rights. PURCHASER agrees to pay such property taxes if, when and as discussed, due and payable. All federal, state and other tax returns and reports, domestic or foreign, required to be filed by or on behalf of PURCHASER with respect to the ownership or operation of the Patent and Related Proprietary Rights will be duly filed, and all taxes and other assessments and levies (including interest and penalties) and all installments of estimated taxes, domestic or foreign, required to be paid by PURCHASER will be duly paid. PURCHASER will not waive any statute of limitations with respect to any tax or other assessment or levy, domestic or foreign, applicable to such Patent and

3

Related Proprietary Rights and such taxes and other assessments and levies which PURCHASER is required by law to withhold or to collect will be duly withheld and collected and will be paid over to the proper governmental agencies and shall be so paid by PURCHASER as required by law. (Plaint.'s 56.1(a)(3) Statement ¶ A13).

Paragraph 9.2 of the Purchase Agreement states:

> If the Agreement is terminated in accordance with Paragraph 9.1, it is specifically agreed that all amounts then due and owing SELLER by PURCHASER, including such amounts which constitute overdue, delinquent or otherwise unpaid amounts under this Agreement plus one hundred thousand dollars ($100,000) per year from and including the year of such termination to and including the year of the last to expire of the patent rights, shall then constitute liquidated damages under this Agreement, and PURCHASER guarantees SELLER that it will submit a written statement and make full payment of such liquidated damages to SELLER within THIRTY (30) days of the effective date of termination. (Plaint.'s 56.1(a)(3) Statement ¶ A41).

Paragraph II of the License Agreement states:

> Subject to the terms herein set forth, LICENSOR hereby grants LICENSEE an exclusive license under the Patent and Related Proprietary Rights to use and sell PRODUCTS within the MARKET agreed. (License Agreement).

Pursuant to the License Agreement, PRODUCT ("Product") is "metallic sheathed heat sensitive cable (sold under the trademark $CT^2C$)" covered by the Patent and Related Proprietary Rights. (License Agreement; Plaint.'s 56.1(a)(3) Statement ¶ B10). The MARKET is "restricted to the field of Refactory Lined Process Vessels ... through the world".

"Patent Rights" as used within the Purchase Agreement "mean the rights embodied in and deriving from United States Letters Patent 4,491,822; 4,540,972; and 4,614,024, and all foreign patents and applications corresponding thereto." (License Agreement). "Proprietary Rights ... mean all purchasing, manufacturing, marketing, sales and installation information and materials including

4

know-how, drawings, sketches, plans, designs, specifications, data, methods, processes, techniques, inventions or discoveries whether patentable or not which relate in any way to the PRODUCTS covered by the Patent Rights." (License Agreement).

Paragraph VII of the License Agreement states, in pertinent part:

> Quantities of the PRODUCT received by [Pacific] from [XCO] will be furnished by [XCO] to [Pacific] for $8.75 U.S. per foot for 3 mm ... Starting with the fifth anniversary of the date of this Agreement through the balance of the term ... the purchase will be subject to negotiation between [Pacific] and [XCO], with changes in price being substantiated by [XCO]'s submittal of product manufacturing cost increases. PRODUCT configurations other than that described in the preceding shall be priced at the previous most favorable customer price. (Plaint.'s 56.1(a)(3) Statement ¶ C 10).

## II. Patent Maintenance Fees

On April 12, 1991, Pacific paid its prorations at the closing pursuant to the Purchase Agreement. (Plaint.'s 56.1(a)(3) Statement ¶ A16). In July 1992, Pacific paid patent tax maintenance fees for Australia Patent Nos. 555,243 and 577,208; Brazil Patent No. P18206249; West Germany No. P32793987; South Africa No. 82/7958; European Patent No. 0 078 675 designated in Austria, Belgium, France, Netherlands, Italy, Luxembourg, Sweden, Switzerland, and the United Kingdom; and U.S. Patent No. 4,491,822. (Id., at ¶¶ A17-18). In September 1992, Pacific paid the patent tax maintenance fees for Mexico Patent No. 158570. (Id., at ¶ A19).

In September 1993, Pacific did not pay the patent tax maintenance fees for Australia Patent Nos. 555,243 and 577,208; Brazil Patent No. P18206249; and South Africa Patent No. 82/7958. (Plaint.'s 56.1(a)(3) Statement ¶ A20).

In October 1993, Pacific paid the patent tax maintenance fees for West Germany Patent No. P32793987 and European Patent No. 0 078 675. (Plaint.'s 56.1(a)(3) Statement ¶ A21).

5

In November 1993, South Africa Patent No. 82/7958 lapsed for failure to pay patent maintenance fees. (Plaint.'s 56.1(a)(3) Statement ¶ A22). In July 1994, Australia Patent Nos. 555,243 and 577,208 lapsed for failure to pay patent maintenance fees. (Id., at ¶ A23).

In September 1994, Pacific paid the patent tax maintenance fees for West Germany Patent No. P32793987 and European Patent No. 0 078 675. (Plaint.'s 56.1(a)(3) Statement ¶ A24).

In July 1995, Brazil Patent No. P18206249 lapsed for failure to pay the patent tax maintenance fees. (Plaint.'s 56.1(a)(3) Statement ¶ A25). In August 1995, Pacific paid the patent tax maintenance fees for West Germany Patent No. P32793987 and European Patent No. 0 078 675. (Id., at ¶ A26).

In August 1996, Pacific paid the patent tax maintenance fees for West Germany Patent No. P32793987 and European Patent No. 0 078 675. (Plaint.'s 56.1(a)(3) Statement ¶ A27).

In March 1997, Pacific paid the patent tax maintenance fees for US Patent No. 4,540,972. (Plaint.'s 56.1(a)(a) Statement ¶ A28). In September 1997, Pacific did not pay the patent tax maintenance fees for West Germany Patent No. P32793987 and European Patent No. 0 078 675. (Id., at ¶ A29).

In March 1998, XCO received notice of the nonpayment of foreign patent maintenance fees and annuities and that some foreign patents had lapsed. (Def.'s 56.1(B)(3) Statement ¶ A6). In April 1998, European Patent No. 0 078 675 designated in Belgium lapsed for failure to pay the patent tax maintenance fees. (Plaint.'s 56.1(a)(3) Statement ¶ A30). In June 1998, European Patent No. 0 078 675 designated in Switzerland and the United Kingdom lapsed for failure to pay the patent tax maintenance fees. (Id., at ¶¶ A31-32). In July 1998, European Patent No. 0 078 675 designated in Netherlands, Austria, Italy, and Sweden lapsed for failure to pay the patent tax maintenance fees.

(Id., at ¶¶ A33-34, A36, 38). In September 1998, European Patent No. 0 078 675 designated in France lapsed for failure to pay patent tax maintenance fees. (Id., at ¶ A35). In November 1998, West Germany Patent P32793987 lapsed for failure to pay the patent tax maintenance fees. (Id., at ¶ A37).

Pursuant to paragraph 9.1 of the Purchase Agreement, and in accord with the notice provision thereof, XCO informed Pacific, by letters dated May 19, 1998 and June 8, 1998, that it considered Pacific's failure to pay maintenance fees and allowance of the patents to lapse to be breaches of the Purchase Agreement. (Plaint.'s 56.1(a)(3) Statement ¶ A40). The letters stated that the failure of XCO to reinstate the patent protection would result in XCO's declaration of the Purchase Agreement being terminated. XCO did not make any declaration subsequent to the letters that the Purchase Agreement was terminated. (Def.'s 56.1(B)(3) Statement ¶ A10).

III. Manufacture and Purchase of Heat Sensitive Cable

In 1991, XCO requested Pacific consent to manufacture the Product. Both XCO and Pacific knew and understood that manufacturing would mean that XCO would have another entity manufacture and assemble the components of the wire cable. (Def.'s 56.1(b)(3) Statement ¶ B1). During the time period of 1991 to 1993, XCO contracted with Halpern Engineering and Conductive Technologies to assemble and manufacture the Product for XCO. (Plaint.'s 56.1(a)(3) Statement ¶¶ B12-13). After XCO received the Product from the manufacturer, XCO would draw down (reduce) the diameter and ameal (heat) the wire cable sheath to meet the requirements of XCO's customers. (Def.'d 56.1(b)(3) Statement ¶ B2).

From 1993 to 1997, XCO purchased the Product from Pacific, who was having the Product manufactured by a third-party vendor. (Plaint.'s 56.1(a)(3) Statement ¶ B14). In July 1997, Pacific

informed XCO that it would no longer supply XCO with the Product because it was unable to do so. (Id., at ¶ B15). In late 1997, XCO sought to use BICC Pyrotenax as a potential manufacturing source for the Product. However, the Product XCO received proved to be unacceptable to XCO. (Id., at ¶ B16).

In 1998, Bayard C. Davis ("Davis") began developing a new $CT^2C$ product and new method of manufacturing that product. (Plaint.'s 56.1(a)(3) Statement ¶ B17). The new product is manufactured by a manual process; whereas, the "old" $CT^2C$ Product was manufactured in a continuous process via a machine. (Id., at ¶¶ B20-21). A patent application has been submitted for the "new" $CT^2C$. (Patrick Ertel Dep. p. 207).

The new $CT^2C$ heat sensitive cable is manufactured by XCO by CWK Consulting. (Plaint.'s 56.1(a)(3) Statement ¶ B19). The new $CT^2C$ product is manufactured by Christopher Kious at the XCO plant pursuant to the direction and control of Davis and Kevin Kious, officers of XCO. (Def.'s 56.1(b)(3) Statement ¶ B5). All of the materials, supplies, insulation material, wire components and drawing and heating equipment used for the assembly and manufacture of the new $CT^2C$ product are owned and paid for by XCO. (Id., at ¶ B6).

The insulation material of the new $CT^2C$ product is manganese sesquioxide that is heat treated in an oxidizing atmosphere at a temperature in excess of 1800°F. The manganese sesquioxide has an insulation resistance range of approximately 10,000 and 30,000,000 ohms. (Plaint.'s 56.1(a)(3) Statement ¶ B22).

During 1998 and 1999, XCO entered into purchase orders with Pacific to provide the new heat sensitive cable at a negotiated price of $9.00 per foot. (Def.'s 56.1(b)(3) Statement ¶ C4). In 1999, XCO quoted Pacific a price of $26.00 per foot for heat sensitive cable. Michael Fone

("Fone") of Pacific contacted XCO twice to discuss the price increase. Kious informed Fone, "That's the price. Take it or leave it." Pacific did not purchase the cable which was the subject of these discussions. (Fone Dep. pp. 82-89).

On March 15, 2001, Pacific sent a Request for Quotation to XCO for 1,500 feet of heat sensitive cable. (Plaint.'s 56.1(a)(3) Statement ¶ C11). On March 20, 2001, XCO quoted Pacific a price of $18.00 per foot for the 1,500 feet of cable. (Id., at ¶ C12). On March 21, 2001, XCO submitted a purchase order to XCO for 1,500 feet of cable at the price of $18.00 per foot. (Id., at ¶ C13). Pacific paid for and received the 1,500 feet of cable. (Id., at ¶ C14).

On March 29, 2001, Pacific sent a Request for Quotation to XCO for 2,000 feet of heat sensitive cable. (Plaint.'s 56.1(a)(3) Statement ¶ C15). On April 2, 2001, XCO quoted Pacific a price of $17.10 per foot for the 2,000 feet of cable. (Id., at ¶ C16). On April 21, 2001, Pacific submitted a purchase order to XCO for the 2,000 feet of cable at $17.10 per foot. (Id., at ¶ C17). Pacific paid for and received the 2,000 feet of cable. (Id., at ¶ C 18).

On or about August 23, 2001, Pacific sent a Request for Quotation to XCO for 5,000 feet of heat sensitive cable. (Plaint.'s 56.1(a)(3) Statement ¶ C19). On September 4, 2001, XCO quoted Pacific a price of $12.00 per foot for the 5,000 feet of cable. (Id., at ¶ C20). On October 10, 2001, Pacific submitted a purchase order to XCO for the 5,000 feet of cable at $12.00 per foot. (Id., at ¶ C21). Subsequently, Pacific received a letter of credit and the cable. (Id., at ¶ C23). Pacific also issued an e-mail to XCO on October 10, 2001, requesting that XCO substantiate the prices of $18.00, $17.00, and $12.00 per foot. (Def.'s 56.1(b)(3) Statement ¶ C14).

## ANALYSIS

### I. XCO's Motion for Summary Judgment On Count I of Its Amended Complaint

XCO argues that Pacific breached the clear and unambiguous language of the Purchase Agreement by failing to pay the required maintenance fees. In light of Pacific's breach, XCO is entitled to the contractually provided liquidated damages in the sum of $600,000. Pacific argues that Paragraph 1.5.3 of the Purchase Agreement is ambiguous and does not specify payment of patent maintenance fees after closing.

To sustain a breach of contract action, a Plaintiff must establish that a contract exists between the parties, that plaintiff performed its obligations under the contract, that defendant did not perform its obligations under the contract, and an injury or damages as a result of the breach. *See Jackson v. Hammer*, 274 Ill. App. 3d 59, 64 (1995); *Berry v. Oak Park Hospital*, 256 Ill. App. 3d 11, 19 (1993).

Pursuant to Illinois law, if a written contract is unambiguous and contains no uncertain terms, interpretation of the contract is a question of law for the court, and no evidence outside the four corners of the contract may be employed to construe its terms. *See National Diamond Syndicate, Inc. v. United Parcel Serv., Inc.*, 897 F.2d 253, 256 (7th Cir. 1990) (*National*). Whether a contract is ambiguous is a question of law and is deemed ambiguous only if the language of the contract is fairly or reasonably susceptible of more than one construction. *See National*, 897 F.2d at 256.

Extrinsic evidence can be used to show that a contract is ambiguous. However, extrinsic evidence cannot be used to create an ambiguity. *See Murphy v. Keystone Steel & Wire Co.*, 61 F.3d 560, 565 (7th Cir. 1995) (*Murphy*). The party claiming the ambiguity must produce objective facts, not self-serving or subjective testimony, to show that a contract which looks clear on its face is

10

actually ambiguous. *See Murphy*, 61 F.3d at 565. An interested party, such as a party to the litigation or an agent or employee of a party, cannot create an ambiguity in a contract by his or her oral testimony. *See Matthews v. Sears Pension Plan*, 144 F.3d 461, 467 (7th Cir. 1998).

In the instant case, Pacific argues that Paragraph 1.5.3 of the Purchase Agreement is ambiguous because the second sentence, which states, in pertinent part, that "PURCHASER will be responsible for all expenses of any kind relating to the Patent and Related Proprietary Rights" does not specifically state that Pacific had the mandatory obligation to pay foreign maintenance fees and does not define "all expenses" to include the mandatory obligation to pay foreign patent maintenance fees. In support of its argument, Plaintiff identifies extrinsic evidence consisting of letters sent from XCO to patent owners which indicated the amount due for foreign patent maintenance fees and one column indicating "pay" and another indicating "drop", evidencing that payment of the maintenance fees was optional.

Paragraph 1.5.3 is not ambiguous. The plain language of the contract indicates that Pacific was to pay "all expenses of any kind relating to the Patent and Related Proprietary Rights". "All" is defined as "the whole or quality", "every". Webster's 3rd New Inter. Dictionary 54 (3rd ed. 1986). Pacific does not dispute that the foreign maintenance fees are related to the U.S. Patents as they are required to prevent a foreign patent from lapsing. Accordingly, pursuant to Paragraph 1.5.3, Pacific was required to pay every expense of any kind relating to the U.S. Patents after closing.

Contrary to Pacific's argument, the first sentence of Paragraph 1.5.3 does not create an ambiguity in the second sentence because the first sentence specifies property taxes and patent maintenance fees when discussing the parties' responsibilities prior to closing. The inclusion of specified fees to be paid prior to closing does not alter the requirement that Pacific pay "*all* expenses

*of any kind* relating to the Patent".

Furthermore, Pacific's argument that XCO's letters to Pacific which indicated a "pay" and "drop" column do not establish an ambiguity in the contract. XCO's attorney, who sent the letters, testified that the forms that contained the "pay" and "drop" columns were received from various patent tracking services. In turn, he forwarded the forms to Pacific to insure that Pacific knew of the upcoming due fees; XCO's attorney did not prepare the forms. In addition, Pacific ignores another letter XCO's attorney sent to Pacific in which it stated, in pertinent part:

> With the transfer of the files that has taken place, and with the information concerning the European Patent, we presume that your office will now assume complete responsibility for all maintenance fees and annuities in connection with all of these patent rights.

Based on the above, the clear and unambiguous language of Paragraph 1.5.3 required that Pacific pay all expenses relating to the Patents and Related Proprietary Rights, including the foreign maintenance fees. Accordingly, Pacific breached Paragraph 1.5.3 of the Purchase Agreement.

Plaintiff next argues that XCO is not entitled to summary judgment because the liquidated damages clause is unenforceable because it is a penalty.

When a contract provision specifies damages, Illinois law draws a distinction between liquidated damages, which are enforceable, and penalties, which are not enforceable. *See Checkers Eight Ltd. P'ship v. Hawkins*, 241 F.3d 558, 561 (7th Cir. 2001). Whether a contract provision is a penalty or a valid liquidated damages clause is a question of law. *Med+Neck & Back Pain Ctr. v. Noffsinger*, 311 Ill. App. 3d 853, 860 (2000) (*Med+Neck*). The burden of proving that a liquidated damages clause is not enforceable rests with the party making such assertion. *See Pav-Saver Corp. v. Vasso Corp.*, 143 Ill. App. 3d 1013, 1019 (1986) (*Pav-Saver*).

12

Generally, a liquidated damages clause is valid and enforceable if: (1) the parties agreed in advance to the amount of damages that might arise from a breach; (2) the amount of liquidated damages was reasonable at the time the contract was entered, bearing some relation to the damages that might be incurred; (3) the amount of actual damages would be uncertain and difficult to prove; and (4) the damages must be for a specific amount for a specific breach – the damages may not be used as a threat to secure performance or as a penalty to punish nonperformance. *See Med+Neck*, 311 Ill. App. 3d at 860. The ease or difficulty of determining damages is a matter to be determined at the time of contracting – not at the time of the breach. *See Pav-Saver*, 143 Ill. App. 3d at 1019.

In the instant case, there are no disputed facts that the parties entered into the Purchase Agreement that explicitly contained a liquidated damages clause. As to the second factor, XCO argues that the $100,000 per year through the life of the U.S. Patents is not unreasonable in light of the agreed purchase price of $1.25 million and because it is flexible in that, if the breach occurs late in the contract period, liquidated damages are less than if the breach occurs early in the contract period. Neither party provides any facts pertaining to the $100,000 and its relation to the damages that might be incurred as a result of Pacific's breach. XCO argues that the decrease in sales from 1998 through 2001 evidences that the $100,000 is reasonable. Such argument ignores that the reasonableness of the damages must be determined at the time of contracting, not following the breach. *See Med+Neck*, 311 Ill. App. 3d at 860; *Pav-Saver*, 143 Ill. App. 3d at 1019.

In addition, neither party presents facts demonstrating that the actual damages would have been difficult to ascertain an amount and difficult to prove at the time of contracting. XCO identifies possible infringement of some of the foreign patents in 1998 and 1999 in its argument that damages in patent infringement cases are inherently difficult to ascertain. Accepting XCO's argument as true,

13

such argument is not dispositive because the contract was entered into in 1991, not 1998 and 1999. Patent infringement concerns in 1998 and 1999 could not have been the basis of having difficulty ascertaining the amount of damages in 1991. Furthermore, the liquidated damages clause contradicts the assertion that the amount of damages would be difficult to ascertain as it includes in the damages calculation any delinquent or otherwise unpaid amounts due under the Purchase Agreements. These delinquent or otherwise unpaid amounts could be ascertained from the contract price and the amount paid up to the date of the breach. Lastly, the liquidated damages clause provides for the same specific amount to be paid for a breach of any of the Purchase Agreement provisions. Based on the above facts, the liquidated damages clause is a penalty clause and a mechanism designed to secure Pacific's performance of the contract.

Pacific also argues that summary judgment should be denied because XCO waived its breach of contract claim.

Waiver is the intentional relinquishment of a known right. Parties to a contract may waive provisions placed in a contract by conduct indicating that strict compliance with the contractual provisions is not required. *See Ryder v. Bank of Hickory Hills*, 146 Ill. App. 3d 98, 105 (1992) (*Ryder*). An implied waiver of a legal right must be proved by a clear, unequivocal, and decisive act by the party who is alleged to have committed the waiver. *See Ryder*, 146 Ill. App. 3d at 105. "Merely receiving payments already due and still collectible as debt at the time notice of nullity was given should be no waiver. That is no more than a mitigation of damages." Corbin on Contract, § 40.4 (Matthew Bender 2001); *see also McElroy v. B.F. Goodrich Co.*, 73 F.3d 722, 724 (7th Cir. 1996) (making the best of a bad deal does not constitute waiver); *In re Krueger*, 192 F.3d 733, 739-41 (7th Cir. 1999) (bank did not waive rights by accepting late payments on second mortgage).

14

Pacific argues that XCO's act of accepting continued payment for the purchase of the patents following XCO's knowledge that some of the foreign patents had lapsed because of nonpayment of maintenance fees constitutes an implied waiver. Pacific's argument is without merit. The monies XCO received and accepted after having knowledge that some foreign maintenance fees had not been paid by Pacific were monies already due to XCO for the purchase of the Patents. Pacific had already purchased the Patents and was enjoying the benefits of such purchase. The acceptance of this already due money from the purchase of the Patents does not constitute an implied waiver by XCO of Pacific's duty to pay maintenance fees under a different paragraph of the Purchase agreement. *See* Corbin on Contracts § 40.4 (Matthew Bender 2001); *McElroy*, 73 F.3d at 724; *In re Krueger*, 192 F.3d at 739-41).

Based on the above, XCO has established that no issues of genuine fact exist as to the existence of a contract between the two parties, that XCO performed its obligations under the contract, and that Pacific did not perform its obligations under Paragraph 1.5.3 of the contract. As to the last element of its breach of contract claim, XCO seeks damages pursuant to the liquidated damages clause which has been determined to be a penalty and unenforceable. XCO has not presented any undisputed facts as to any other damages due to Pacific's breach. Therefore, XCO's Motion for Summary Judgment on its breach of contract claim must be denied.

## II. XCO's Motion for Summary Judgment On Count I of Pacific's Counterclaim

In Count I of Pacific's Counterclaim, Pacific seeks royalties from XCO allegedly owed to Pacific for the time periods of 1991 to 1993 and 1998 to the present. As to the royalties allegedly owed for 1991 to 1993, XCO argues that claims for such royalties are barred by the California statute of limitations.

Pursuant to the California Code of Civil Procedure, any action based on a written contract must be brought within four years of the events that give rise to the action. Cal. Civil Code § 337. However, "[w]here cross-demands for money have existed between persons at any point when neither demand was barred by the statute of limitations, and an action is thereafter commenced by one such side, the other person may assert in the answer the defense of payment ... notwithstanding that an independent action asserting the person's claim would at the time of filing the answer be barred by the statute of limitations." Cal. Civil Code § 431.70. "A cause of action accrues at the moment when the party who owns it is entitled to bring and prosecute an action thereon." *Bainbridge v. County of Riverside*, 167 Ca. App. 2d 418, 422 (1959).

Pacific argues that its cross-claims as to the royalties for 1991 to 1993 are not barred pursuant to Section 431.70. However, Section 431.70 is not applicable because the cross-demands for money between Pacific and XCO did not exist at any point when neither demand was barred by the statute of limitations. Pacific's claim as to the 1991 to 1993 royalties became time barred in 1997. During this time, XCO did not have a cross-demand for money. XCO's cross-demand for money did not accrue until March 3, 1998, when XCO was notified of Pacific's failure to pay foreign maintenance fees. Accordingly, these claims as to royalties owed for 1991 to 1993 are time barred.

XCO argues that summary judgment as to Pacific's claims pertaining to royalties owed for 1998 to present is proper because no royalties were owed because XCO only sold the new $CT^2C$ which is not covered by the License Agreement. XCO alleges that comparing the U.S. Patents subject to the License Agreement to the new $CT^2C$ demonstrates that the product sold in 1998 to the present is not covered by the License Agreement because the new $CT^2C$ is not covered by the Patent and Related Proprietary Rights of the License Agreement. Any $CT^2C$ cable that is not covered by

16

the Patent and Related Proprietary Rights is not a "Product" and, thus, not subject to royalty obligations of the 1991 License Agreement.

A patent "covers" only that which falls within the scope of the patent's properly construed claims. *See Fromson v. Anitec Printing Plates, Inc.*, 132 F.3d 1437, 1445 (Fed. Cir. 1996). XCO argues that the new $CT^2C$ is not a "Product" under the License Agreement because it is different than the U.S. Patent is "old" products because it has (1) a different method of manufacturing, (2) a different method of treating the insulation material, and (3) different operating parameters.

In response, Pacific presents the affidavit of an expert who analyzed the final product of both the new and old $CT^2C$. Pacific's expert opines that both $CT^2Cs$ contain manganese sesquiozide and hausmannite. Pacific argues that this opinion presents an issue of fact whether the two $CT^2Cs$ are in fact different. Pacific does not address how the similar composition of the *final* two products disputes the difference in the manufacture of the products, i.e., the old $CT^2C$ is manufactured with manganese dioxide, and the new $CT^2C$ is not.

Pacific also provides an expert opinion of a patent attorney who opines that the new $CT^2C$ falls within the License Agreement because of the presence of manganese sesquioxide in both *final* products. The patent attorney does not address the differences in the manufacture and operating parameters between the two products.

Based on the above, Pacific has failed to demonstrate that a genuine issue of fact exists as to whether the new $CT^2C$ is covered by the Patent and Related Proprietary Rights under the License Agreement. The fact that the final products may each contain the same compositions does not negate that the new $CT^2C$ does not fall within the claims of the U.S. Patents as demonstrated by the differences in the method of manufacturing and different operating parameters. Because the new

$CT^2C$ does not fall within the claims of the U.S. Patents, it would not be subject to the License Agreement because it is not a Product as defined by the License Agreement, i.e., a "metallic sheathed heat sensitive cable (sold under the trademark $CT^2C$)" *covered by the Patent and Related Proprietary Rights*. (Emphasis added). Accordingly, XCO was not required to pay loyalties to Pacific for the sale of the new $CT^2C$ under the License Agreement.

For the reasons stated above, XCO's Motion for Summary Judgment on Count I of Pacific's Counterclaim is granted.

III. XCO's Motion for Summary Judgment On Count II of Pacific's Counterclaim

In Count II of Pacific's Counterclaim, Pacific alleges that XCO breached Paragraph VII of the License Agreement by charging greatly increased prices for the Product without justification.

XCO argues that summary judgment is proper as to Count II of Pacific's Counterclaim because the heat sensitive cable that was purchased in 2001 was the new $CT^2C$; therefore, the cable was not covered by the License Agreement.

As discussed above, Pacific has failed to demonstrate that a genuine issue of material fact exists whether the new $CT^2C$ product was covered by the License Agreement. Because the new $CT^2C$ product was not covered by the License Agreement and the new $CT^2C$ product was the only product Pacific purchased from XCO, XCO could not have breached the License Agreement by failing to substantiate a price increase for a product not covered by the License Agreement.

Accordingly, XCO's Motion for Summary Judgment on Count II of Pacific's Counterclaim is granted. Based on this finding, the Court need not address the parties' remaining arguments as to Count II of Pacific's Counterclaims.

## CONCLUSION

For the foregoing reasons, XCO's Motion for Summary on Count I of its First Amended Complaint is denied. XCO's Motion for Summary Judgment on Count I of Pacific's Counterclaim is granted. XCO's Motion for Summary Judgment on Count II of Pacific's Counterclaim is granted.

Dated: October 1, 2002

JOHN W. DARRAH
United States District Judge